UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DANIEL GRAHAM *and* DEVON HAILSTOCK,

                                Plaintiffs,

              -v-

CHA CHA MATCHA, INC, *et al.*,

                                Defendants.

23 Civ. 9911 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

    Daniel Graham and Devon Hailstock, two former baristas at the Cha Cha Matcha cafe chain, bring this action against their former employer; its chief executive officer, Jay Gujjar; and their former supervisor, Josip Drazenovich. The plaintiffs, both Black men, allege that they were subjected to a hostile workplace environment rife with racial slurs and other offensive conduct.

    Graham and Hailstock assert claims under 42 U.S.C. § 1981, the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-502(a) *et seq.* ("NYCHRL"). Pending now is a motion to dismiss, in part, the First Amended Complaint ("FAC") from Cha Cha Matcha and Gujjar (together, "defendants").[1] For the reasons that follow, the Court grants the motion in part and denies it in part.

---

[1] Drazenovich has not yet appeared in this action.

I.  **Background**

A.  **Factual Background**[2]

Graham and Hailstock are both Black men who were formerly employed as baristas by Cha Cha Matcha, a specialty cafe chain focusing on matcha tea products. They allege that, as employees of Cha Cha Matcha, they were subjected to a hostile work environment based on their race and, in Graham's case, on his gender. The allegations involve discriminatory conduct by two supervisors over two distinct periods, the company's alleged failure to address complaints, and the mistreatment of other employees at Cha Cha Matcha.

1.  **Graham**

Graham began working for Cha Cha Matcha as a barista in September 2017. FAC ¶ 38. In 2019, Graham's then-supervisor, Clay Englehart, who is white, exclaimed "What up nigga" in front of Graham, Hailstock, and another employee. *Id.* ¶ 40. When Graham objected, Englehart allegedly threatened him, saying, "Yeah try to go to the owner and report me. See what happens because I know nothing is going to happen to me." *Id.* ¶¶ 41–42.

In February 2019, Graham complained about being overloaded with work outside of his official duties. *Id.* ¶¶ 49–50. In response, Graham alleges he was terminated and offered severance in exchange for signing a non-disclosure agreement. *Id.* ¶ 51. Graham refused and emailed Cha Cha Matcha's owners about the wrongful termination. *Id.* ¶ 52. He was rehired a few weeks later. *Id.* ¶ 53. Graham alleges that Cha Cha Matcha's firing and rehiring of him was calculated to show how easily he could be terminated for complaining. *Id.*

---

[2] The Court draws the facts in this decision primarily from the First Amended Complaint. Dkt. 19 ("FAC"). For the purpose of resolving the partial motion to dismiss, the Court assumes all well-pled facts in the FAC to be true and draws all reasonable inferences in favor of plaintiffs. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

2

In March 2020, Graham was furloughed due to the COVID-19 pandemic; in June 2021, he returned as a general manager. *Id.* ¶¶ 54, 56. Upon his return, Graham alleges that the new director of operations and district manager, Drazenovich, engaged in repeated discriminatory conduct.

Graham alleges several incidents in which Drazenovich used racial slurs, including:

- In June 2021, saying "You can't be serious my nigga" to Graham in Hailstock's presence. *Id.* ¶ 57.
- In August 2021, saying "It's cool if I say nigga" in front of Graham, Hailstock, and another employee. *Id.* ¶ 137.
- On October 18, 2021, telling Graham he enjoyed using the word "nigga" to aggravate his Black ex-girlfriend, and that he "can't stop saying nigga." *Id.* ¶ 70.
- On October 25, 2021, telling Graham, "You're the nigga," despite Graham's previous objections. *Id.* ¶ 73.

Graham also alleges that Drazenovich discriminated against him on the basis of gender. In July 2021, Drazenovich suddenly and forcefully grabbed Graham's buttocks with both hands in Hailstock's presence. *Id.* ¶ 59. Graham felt "humiliated" and "shocked" by Drazenovich's behavior, believing Drazenovich had acted this way to "intentionally emasculate" him in front of coworkers. *Id.* ¶¶ 60, 62, 65. Graham alleges Drazenovich did not subject female employees to similar physical abuse. *See id.* ¶ 153.

In late January 2022, Graham raised concerns with Drazenovich about news articles describing discriminatory working conditions at Cha Cha Matcha, which Graham felt were "accurate in many ways." *Id.* ¶ 76. Drazenovich dismissed these concerns, stating that because

3

Cha Cha Matcha was hiring "a brown CEO" and "a brown director of operations," there was "no way they can be racist right now." *Id.* ¶ 78.

Graham escalated his complaints to Cha Cha Matcha's CEO, Gujjar, in February 2022. Graham told Gujjar:

> [Drazenovich] is out of line and I can't take his discriminatory treatment any longer. He is constantly inappropriate and is always on drugs and selling drugs. He is disrespectful and it's because of him that we work in a hostile work environment. He even showed up to work intoxicated and harassed me by making a slew of inappropriate comments about me and fellow employees. I fear for retaliation.

*Id.* ¶ 81. After Gujjar dismissed his concerns, Graham resigned, feeling he could not continue to face consistent abuse. *See id.* ¶¶ 85, 87–88, 93, 95.

### 2. Hailstock

In August 2018, Hailstock was hired as a barista by Cha Cha Matcha. *Id.* ¶¶ 96, 98. In March 2019, Hailstock alleges, Englehart used the n-word multiple times while rapping a song. *Id.* ¶ 105. Despite Englehart's initial apology and assurance it wouldn't happen again, he repeated the behavior two weeks later. *See id.* ¶ 106.

Hailstock complained to his manager, Gaelle Win Robin, but Win Robin told him his complaint would amount to nothing because Englehart was a family friend of one of Cha Cha Matcha's owners. *Id.* ¶¶ 107–08. After Hailstock asked Englehart to limit their interactions to work matters, Win Robin told Hailstock he would have to transfer to another location or be terminated. *See id.* ¶¶ 111–12. In November 2019, Hailstock chose to transfer to another Cha Cha Matcha location. *Id.* ¶ 117.

In March 2020, Hailstock was furloughed, and, in June 2021, returned under Drazenovich's supervision. *See id.* ¶¶ 118–20. Like Graham, Hailstock heard Drazenovich use racial slurs. *See id.* ¶ 129. Hailstock also alleges he learned that Drazenovich referred to him as "cunty" in a text message to Graham. *Id.* ¶ 127.

4

Hailstock claims that Drazenovich fostered an environment of fear and retaliation. He alleges that after another Black employee, Chidi, was fired, Drazenovich instructed remaining employees, including Hailstock, to retaliate against Chidi if he appeared at a Cha Cha Matcha location. *See id.* ¶¶ 132–33. Drazenovich also allegedly boasted to Hailstock about his connections in the restaurant industry and claimed he could get Chidi fired from his new job. *Id.* ¶ 134.

According to Hailstock, Drazenovich regularly referred to himself as "HR" and discouraged employees from complaining. *Id.* ¶¶ 170, 175. Hailstock alleges he emailed Gujjar in February 2022 to complain about the hostile work environment, but his emails were either completely ignored or barely acknowledged with only an automated response. *See id.* ¶¶ 176–77. In February 2022, believing the work environment at Cha Cha Matcha would never change, Hailstock resigned. *See id.* ¶ 179.

### 3. Treatment of Other Employees

The FAC contains allegations about the treatment of several other Cha Cha Matcha employees. Plaintiffs claim this further demonstrates the company's hostile work environment. These employees are:

- Selina Wolman: A female employee who was allegedly whipped with a wet rag by another male employee, W. Perkins, while Drazenovich watched, laughed, and recorded the incident on his phone. *Id.* ¶ 154.

- Rosemary: A female employee whom Drazenovich allegedly called a "cunt" in front of Graham and Wolman. *Id.* ¶ 66.

- Unidentified transgender employee: Graham alleges that Drazenovich told him, "I only promoted the tranny so she wouldn't file a sexual assault case against me." *Id.* ¶ 157.

- Unidentified disabled employee: Drazenovich would regularly joke about how "crazy" the employee was. *Id.* ¶ 126.

- Unidentified female customer: Drazenovich would regularly make inappropriate comments about a female customer's body, including speculating about her "butt implants" and trying to engage plaintiffs in sexual discussions about her. *Id.* ¶ 159.

## B. Procedural History

On November 9, 2023, plaintiffs filed their initial Complaint. Dkt. 1. On February 26, 2024, defendants filed a partial motion to dismiss, Dkt. 15, and a memorandum of law in support, Dkt. 16. On February 27, 2024, the Court issued an order requiring plaintiffs to either amend their complaint or oppose defendants' motion by March 18, 2024, warning plaintiffs that "[n]o further opportunities to amend will ordinarily be granted." Dkt. 27.

On March 15, 2024, plaintiffs filed the FAC. Dkt. 19. On April 8, 2024, defendants again filed a partial motion to dismiss, Dkt. 20, and a memorandum of law in support, Dkt. 21 ("Def. Br."). On April 22, 2024, plaintiffs opposed the motion. Dkt. 22 ("Pl. Br.").[3] On April 29, 2024, defendants filed a reply brief. Dkt. 23 ("Def. Reply Br.").

---

[3] Plaintiffs stipulate to the dismissal of their (1) retaliation claims and (2) claims against Gujjar. Pl. Br. at 1 n.1. The Court grants defendants' motion to dismiss these claims. *See Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014).

## II. Legal Standards Governing Motions to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. When resolving a motion to dismiss, the Court must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). That tenet, however, does not apply to legal conclusions. *See Iqbal*, 556 U.S. at 678. Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III. Discussion

### A. Race-Based Hostile Work Environment Under Section 1981

Both plaintiffs allege they were subjected to a hostile work environment based on race in violation of Section 1981.

#### 1. Legal Principles

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Section 1981 "thus outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." *Patterson v. County of Oneida*, 375 F.3d 206, 224 (2d Cir. 2004); *see also Littlejohn v. City of New York*, 795 F.3d 297, 320 (2d Cir. 2015). The same "core substantive standards" that apply

7

under Title VII apply to claims of employment discrimination under Section 1981. *Patterson*, 375 F.3d at 225.

"To establish a hostile work environment under Title VII, § 1981, or § 1983, a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Littlejohn*, 795 F.3d at 320–21 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). This standard includes both subjective and objective elements. Objectively, "the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014); *see also Harris*, 510 U.S. at 22–23. Subjectively, the victim "must . . . perceive the work environment to be abusive." *Raspardo*, 770 F.3d at 114.

"[A] work environment's hostility should be assessed based on the totality of the circumstances." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (internal quotation marks omitted). Factors that may be considered include: "[1] the frequency of the discriminatory conduct; [2] its severity; [3] whether it is physically threatening or humiliating, or a mere offensive utterance; and [4] whether it unreasonably interferes with an employee's work performance." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010) (quoting *Harris*, 510 U.S. at 23). At the motion to dismiss stage, however, a plaintiff need only plead that he or she was faced with "harassment . . . of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse"—a bar that the Second Circuit has "repeatedly cautioned against setting . . . too high." *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003).

### 2. Application

Defendants argue that the conduct as pled consisted of a "few isolated incidents of racial enmity" and is insufficiently severe or pervasive to state a claim. Def. Br. at 20–21.

That is unpersuasive. The FAC alleges that plaintiffs were subjected to repeated virulent racial slurs by their supervisor over a period of several months in 2021. FAC ¶¶ 57, 70, 73, 105–06, 109, 116, 137 (alleging at least six separate incidents in which supervisor called plaintiffs a "nigga" or used the word "nigga" in their presence). As the Second Circuit has emphasized, "perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24 (2d Cir. 2014) (cleaned up); *see also Banks v. Gen. Motors, LLC*, 81 F.4th 242, 266 (2d Cir. 2023) ("The epithet has been described as a term that sums up all the bitter years of insult and struggle in America, a pure anathema to African-Americans, and probably the most offensive word in English." (cleaned up)).

The use of that epithet in this case—including several instances in which it was directed specifically at plaintiffs—suffices to plead "that a reasonable employee would find the conditions of her employment altered for the worse." *Terry*, 336 F.3d at 148. That is especially so given the frequency with which this slur was allegedly used over a short period. *See Gorzynski*, 596 F.3d at 102 ("frequency of the discriminatory conduct" may be considered in assessing a "work environment's hostility"); *see also, e.g., Levy v. NYC Health + Hosps.*, 660 F. Supp. 3d 220, 234–35 (S.D.N.Y. 2023) (hostile work environment claim adequately pled where complaint alleged "two incidents" in which supervisor "directed a racial slur" at plaintiff and "repeatedly" used slur in referring to other colleagues); *Luo v. AIK Renovation Inc.*, No. 23 Civ. 5878 (LJL), 2023 WL 8113437, at *5 (S.D.N.Y. Nov. 22, 2023) (hostile work environment claim

9

adequately pled where complaint alleged "several" uses "of the n-word in reference to Black people"); *Spencer v. Glob. Innovative Grp., LLC*, No. 17 Civ. 7604 (PGG) (BCM), 2023 WL 6633860, at *9–12 (S.D.N.Y. Oct. 12, 2023) (hostile work environment claim adequately pled where complaint alleged supervisor "'loudly and clearly' used the n-word 'on more than five occasions'" in personal phone calls overheard by plaintiff). Measured against the assembled case law, the FAC has pled enough to survive a motion to dismiss.

Defendants rely upon *Moody v. Empire Hotel Development, Inc.*, No. 20 Civ. 2203 (PMH), 2023 WL 5480729 (S.D.N.Y. Aug. 24, 2023). But *Moody* was disposed of at the summary judgment stage, a vital distinction that defendants conspicuously overlook. At summary judgment, a plaintiff must adduce sufficient admissible evidence on which a reasonable jury could find in her favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On a motion to dismiss, however, a complaint need only plead sufficient factual allegations that make the claim to relief plausible. *See Iqbal*, 556 U.S. at 678. Thus, in the context of a hostile work environment claim, at summary judgment, a plaintiff must present evidence on which a factfinder could conclude that her workplace was "hostile or abusive," *Raspardo*, 770 F.3d at 114, but, on a motion to dismiss, need only plead facts establishing that "she was faced with harassment" that altered "the conditions of her employment . . . for the worse," *Patane*, 508 F.3d at 113 (quoting *Terry*, 336 F.3d at 148). In any event, *Moody* is readily factually distinguished, as the evidence there supported only that the plaintiff's supervisor had "used the 'n-word' in her presence," not that the supervisor had *called* her the n-word, whereas plaintiffs here allege that they were personally referred to as such. *See Moody*, 2023 WL 5480729, at *11–12; *cf. Spencer*, 2023 WL 6633860, at *11–12 (distinguishing cases in which plaintiff "overheard" their supervisor "use the n-word" and cases in which plaintiff was addressed by "that slur").

The Court thus denies the motion to dismiss the FAC's race-based hostile work environment claim under Section 1981.

### B. Race-Based Hostile Work Environment Under State and City Law

The FAC alleges that both plaintiffs were subjected to a hostile work environment based on race, in violation of the NYSHRL and the NYCHRL. Because Section 1981 acts as a "floor" for the NYSHRL and the NYCHRL, *Johnson v. Everyrealm, Inc.*, 657 F. Supp. 3d 535, 552–53 (S.D.N.Y. 2023), that the FAC pleads a plausible claim under Section 1981 means that the FAC's identical claims under state and city law also necessarily survive.[4]

The Court thus denies defendants' motion to dismiss the FAC's race-based hostile work environment claims brought under state and city law.[5]

---

[4] In August 2019, the NYSHRL was amended to direct courts to construe the NYSHRL, like the NYCHRL, "liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws, including those laws with provisions worded comparably to the provisions of [the NYSHRL], have been so construed." N.Y. Exec. Law § 300. This language thus liberalized the NYSHRL standards, bringing them closer to the standards under the more lenient NYCHRL. It is as of yet unclear whether these two standards are co-extensive, or whether the NYSHRL requires something in between federal and local law for discrimination claims. *See Yost v. Everyrealm Inc.*, No. 22 Civ. 6549 (PAE), 2023 WL 2224450, at *11 (S.D.N.Y. Feb, 24, 2023). Here, because the Court finds that the FAC has pled enough to state a claim under the higher standards of the pre-amendment NYSHRL—which tracked federal law—it need not parse the exact demands of the NYSHRL as amended.

[5] The Court similarly denies defendants' motion to dismiss the FAC's discrimination claims under Section 1981 and the NYSHRL, which rest on the same conduct as the hostile work environment claims. In so moving, defendants argue that the FAC does not plead constructive termination because it ostensibly fails to plead a hostile work environment. Def. Br. at 17–18. Insofar as the FAC has adequately so pled, that argument fails. To succeed on a claim of constructive discharge, a plaintiff must show that he was subjected to working conditions "so difficult or unpleasant that a reasonable person in [his] shoes would have felt compelled to resign." *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996); *see also Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010). The FAC pleads such conditions here—a pattern of severe racial harassment by plaintiffs' direct supervisor. *See, e.g., Atkinson v. Singh*, No. 19 Civ. 3779 (VSB), 2022 WL 137634, at *14 (S.D.N.Y. Jan. 14, 2022) (constructive discharge adequately pled where plaintiff's direct supervisor "regularly belittled" her with "gendered and misogynistic epithets and phrases").

### C. Gender-Based Hostile Work Environment Under State Law

The FAC alleges that Graham was subjected to a hostile work environment based on gender in violation of the NYSHRL and the NYCHRL. That claim is largely based on the incident in which Graham alleges he was sexually assaulted by Drazenovich. FAC ¶¶ 59–60 (Drazenovich "suddenly forcefully grabbed" Graham's "buttocks with both hands" in presence of another employee). In moving to dismiss this claim, defendants argue that the FAC does not plead that the alleged misconduct took place because of Graham's gender. In their view, for a same-sex harassment claim to succeed under *Oncale v. Sundowner Offshore Services*, 523 U.S. 75 (1998), a complaint must allege "that the harasser was homosexual" or that the harasser "was motivated by a general hostility to men in the workplace." Defendants argue that, because the FAC does not plead such facts, the FAC's claim must be dismissed. Def. Br. at 21–22.

Defendants misread *Oncale*. There, the Supreme Court identified several evidentiary routes by which a plaintiff might establish that same-sex harassment was because of sex, but it did not make these pleading requirements or hold that these were exclusive methods of proof. "Every circuit to squarely consider the issue has held that the *Oncale* categories are illustrative, not exhaustive, in nature." *EEOC v. Boh Bros. Constr. Co.*, 731 F.3d 444, 454–55 & n.6 (5th Cir. 2013) (en banc) (collecting cases). The key, *Oncale* explained, is that "[w]hatever evidentiary route the plaintiff chooses to follow," he must show that members of his "sex [were] exposed to disadvantageous terms or conditions of employment to which members of the other sex were not exposed." 523 U.S. at 80–81 (citation omitted); *see also, e.g., Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 119 (2d Cir. 2004) ("stereotyped remarks," which go unmentioned as a method of proof in *Oncale*, "can certainly be evidence that gender played a part" in alleged misconduct).

12

Measured against the proper standards, the FAC's allegations adequately support the inference that Graham was subjected to harassment because of his sex. It alleges that Drazenovich (1) sexually assaulted him by forcefully grabbing his buttocks, FAC ¶ 59, (2) did not subject female employees to physical sexual abuse, *id.* ¶ 63, and (3) targeted him for this misconduct specifically because he is a man, knowing it would be viewed as mere "horseplay" and not taken seriously, *id.* ¶¶ 64–65. At the pleading stage, such disparate treatment is enough to suggest that Drazenovich's action was based on Graham's gender. *See Oncale*, 523 U.S. at 80–81 ("A same-sex harassment plaintiff may also . . . offer direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace."); *see also, e.g., Reid v. Ingerman Smith LLP*, 876 F. Supp. 2d 176, 183–84 (E.D.N.Y. 2012) (plausible inference that actions based on gender where same-sex supervisor "grabbed and squeezed" plaintiff's breast). As courts have recognized, sexual harassment of men can take different forms than sexual harassment of women, and may play on stereotypes of masculinity or use sexualized conduct to assert dominance in ways specific to male-on-male interactions. *See Boh Bros.*, 731 F.3d at 456–60 (plaintiff taunted as "not a manly-enough man" and "mocked" with "sexualized acts"). The FAC's allegations that Drazenovich assaulted him to "emasculate" him in front of coworkers alleges conduct of this sort.[6]

---

[6] To state the obvious, that Drazenovich also allegedly harassed women does not undermine the plausibility of the FAC's claim that his assault towards Graham was motivated by Graham's sex. *E.g.*, FAC ¶¶ 67–68 (alleging that Drazenovich "encouraged" an employee to "whip[] a female employee with a wet rag"). A defendant can engage in different types of harassment within the same workplace. *See Oncale*, 523 U.S. at 80–81. Although "an environment which is equally harsh for both men and women . . . does not constitute a hostile working environment" based on sex, *Brennan v. Metropolitan Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999), the FAC plausibly pleads distinct acts of harassment based on Graham's gender, *see* FAC ¶¶ 59, 65 (sexual assault), 160–64 (sexual conversations about female customers), 166–67 (pornography in the workplace).

The Court thus denies defendants' motion to dismiss the FAC's gender-based hostile environment claims.

## CONCLUSION

For the foregoing reasons, the Court denies defendants' partial motion to dismiss in part and grants it in part. The Court dismisses the FAC's retaliation claims and claims against Gujjar, which plaintiffs abandoned in response to the motion to dismiss. Defendants must answer the FAC by August 8, 2024.

The Clerk of Court is respectfully directed to terminate all pending motions. By separate order, the Court will schedule a date for an initial pretrial conference.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: July 25, 2024
       New York, New York